AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

**Oct 09, 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of )<br>)<br>INFORMATION ASSOCIATED WITH Username )<br>HopelynAusk123116; ID 100004164905535 and )<br>Username marcus.griffin; ID 100006739772423 THAT )<br>IS STORED AT PREMISES CONTROLLED BY )<br>FACEBOOK, INC. ) | Case No.   2:20-sw-0940 DB |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1708; | Possession of Stolen U.S. Mail; |
| 18 U.S.C. § 1704; | Possession of Stolen or Counterfeit Postal Keys or Locks; |
| 18 U.S.C. § 1028A; | Identity Theft; |
| 18 U.S.C. § 1341/43; | Mail and Wire Fraud; |
| 18 U.S.C. § 1344; and | Bank Fraud; and |
| 18 U.S.C. §922(g) | Felon in Possession of a Firearm |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☑ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/Elizabeth Foley (signed electronically)
*Applicant's signature*

Elizabeth Foley, United States Postal Inspector
*Printed name and title*

Sworn to before me and signed telephonically.

Date: ___10/9/2020___

City and state:  Sacramento, California

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

McGREGOR W. SCOTT
United States Attorney
ROBERT J. ARTUZ
Special Assistant U.S. Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| In the Matter of the Search of: | CASE NO. |
| --- | --- |
| INFORMATION ASSOCIATED WITH Username HopelynAusk123116; ID 100004164905535 and Username marcus.griffin; ID 100006739772423 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT |

I, Elizabeth Foley, being first duly sworn, hereby depose and state as follows:

## I.      **INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with the following Facebook user accounts: Username HopelynAusk123116; ID 100004164905535 and Username marcus.griffin; ID 100006739772423 (the "SUBJECT ACCOUNTS"), that are stored at premises owned, maintained, controlled, or operated by FACEBOOK, INC., a social-networking company headquartered at 1 Hacker Way, Menlo Park, California 94025. The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A), to require Facebook to disclose to the government records and other information in its possession, including the contents of communications, pertaining to the subscriber or customer associated with the SUBJECT ACCOUNTS.

2.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents/officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.      I am a Postal Inspector and have been so employed since February 2017.  Currently, I am assigned to the San Francisco Division of the United States Postal Inspection Service (USPIS), and I work out of the Stockton office.  During my tenure, I completed training at the United States Postal Inspection Service Academy in Potomac, MD.  As a part of my official duties, it is my responsibility to investigate violations of federal and state law, including robbery and burglary of postal facilities, destruction of government property, theft of U.S. Mail, possession of stolen U.S. Mail, mail and bank fraud, credit card fraud, identity theft, and counterfeit personal checks and identifications.  As a U.S. Postal Inspector, I have participated in numerous criminal investigations relating to theft of U.S. Mail, possession of stolen U.S. Mail, credit application fraud, bank fraud, identity theft, and counterfeit identifications.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1708 – Possession of Stolen U.S. Mail; 18 U.S.C. § 1704 – Possession of Stolen or Counterfeit Postal Keys or Locks; 18 U.S.C. § 1028A – Identity Theft; 18 U.S.C. § 1341/43 – Mail and Wire Fraud; 18 U.S.C. § 1344 – Bank Fraud; and 18 U.S.C. § 922(g) – Felon in Possession of a Firearm have been committed by Hopelyn Ausk and Marcus Griffin. There is also probable cause to search the SUBJECT ACCOUNTS for information described in Attachment A for evidence of these crimes and items to be seized listed in Attachment B.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant to Facebook, Inc. because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A),

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

## STATEMENT OF PROBABLE CAUSE

7.       In May 2020, I received information from Stockton Police Department Detective Ashlyn Hulse regarding an investigation into Hopelyn Ausk and Marcus Griffin.  The information indicated that Ausk was found in possession of U.S. Mail in the names of others, counterfeit postal keys, and postal locks during a probation search of Ausk and Griffin's residence, who were boyfriend and girlfriend.

8.       On May 27, 2020, Ausk was arrested by local law enforcement on a state arrest warrant during a traffic stop.  Griffin arrived on foot to the traffic stop as the vehicle was being towed.  Griffin was found to be on Post Release Community Supervision (PRCS) with Contra Costa County Probation, which includes search conditions of his residence, and a probation search of Ausk and Griffin's shared residence located at 529 N Monroe #6 in Stockton, CA was executed.

9.       The search of the residence yielded an unregistered Kel-Tec 9mm luger firearm, an extended magazine, a full-auto selector switch, several rounds of three different calibers of ammunition, several pieces of mail that did not belong to Ausk or Griffin, Economic Impact Payment Checks (U.S. stimulus checks) in names other than Ausk or Griffin, notebooks containing personally identifiable information (PII), counterfeit U.S. Postal Service keys, U.S. Postal Service locks, credit cards and several presumed stolen packages.

10.      Ausk was arrested for the following charges: PC 532(A) – Obtaining Money/Etc by False Pretenses; PC 484E(D) – Use Access Account Info W/O Consent; PC 530.5(c)(1) – Possession of Personal ID W/Intent to Defraud; PC 32310 – MFG/Sale/ETC Large Capacity Magazine; PC 484E(A) – Sell/ECT Lost/ECT Access Card; PC 32900 – MFG/ETC Multiburst Trigger; PC 25850(C)(6) – Carrying a Loaded Firearm Not the Registered Owner; PC 484G – Theft By Use of Access Card Data (2 counts).

11.      Law enforcement determined that Griffin was a convicted felon and was arrested for the following charges:  PC 29800(A)(1) – Felon in Possession of a Firearm; PC 32310 – MFG/Sale/ETC Large Capacity Magazine; PC 25850(C)(6) – Carrying a Loaded Firearm Not the Registered Owner;

/ / /

1   PC 32900 – MFG/ETC Multiburst Trigger; PC 30305(A)(1) – Prohibited Person Own/Possess/ETC/

2   Ammunition; PC 466 – Possession of Burglary Tools.

3          12.    On September 9, 2020, Ausk was arrested on warrant 2:20-mj-0134 KJN (E.D. Cal.) for

4   Bank Fraud and booked into the Sacramento County Jail in Sacramento, California.

5          13.    On September 18, 2020, Ausk was interviewed by agents and prosecution.  Ausk stated

6   she often communicated with other co-conspirators via Facebook and Facebook messenger, in particular

7   regarding counterfeit postal keys and sharing photos of such keys.

8          14.    On September 18, 2020, I located a Facebook account with the username

9   "HopelynAusk123116," which I believe was recently used and operated by Ausk during relevant times

10  based on at least (1) the profile photo that matches Ausk's photos in her California Department of Motor

11  Vehicle records and (2) the name "Hopelyn Ausk" is associated with the account user name as well as

12  the name "Hopelyn Griffin" is associated with the profile. Ausk is known to be in a romantic

13  relationship with Griffin.  See below screenshot of the profile photo:



**Hopelyn Griffin**
Student•Hard worker
Family•Loyalty
Independent
love doesnt walk away people do...

26         15.    I believe the Facebook account with the username "marcus.griffin" was, and continues to

27  be, operated by Griffin during relevant times based on at least (1) the profile photo that matches

28  / / /

1  Griffin's photos in his California Department of Motor Vehicle records and (2) the name "Marcus

2  Griffin" is associated with the profile.  See below screenshot of the profile:



**Marcus Griffin**

Life's Short, Forget Your Problems, Be Happy & Live Your Life Cause Tomorrow Is Never Promised

Timeline    About    Friends    Photos    Videos    More ▾                    ⊙ Message    •••

15      16.      In furtherance of the investigation, I began monitoring these publicly-available Facebook

16  accounts.  On September 18, 2020, I submitted a preservation request for the aforementioned accounts to

17  Facebook, Inc.

18      17.      In previously filed affidavits, for search warrants 2:20-sw-0617-AC (E.D. Cal.) and 2:20-

19  SW-0779 KJN through 2:20-SW-0783 KJN (E.D. Cal)[1],  I established there was probable cause to

20  believe Hopelyn Ausk and Marcus Griffin possessed unregistered firearms, possessed stolen mail,

21  possessed counterfeit postal keys, and committed identity theft and bank fraud.  Additionally, there was

22  probable cause to believe the Instagram accounts for user hopelyn_x0x and itsmarcus_betch contained

23  evidence of mail theft, identity theft, bank fraud and possession of an unregistered firearm including,

24  without limitation, photographs, messages, and other records.  Additionally, there was probable cause to

25  / / /

26

27  _____

28  [1] The combined affidavit for a criminal complaint and search warrants 2:20-SW-0779 KJN through
2:20-SW-0783 KJN (E.D. Cal), filed at 2:20-mj-0134-KJN (E.D. Cal.), is hereby incorporated by
reference in this affidavit as Attachment C.

1 believe that the 823 Sullivan residence contained evidence of unregistered firearms, stolen mail,

2 counterfeit postal keys, identity theft, and bank fraud.

3       18.    On July 15, 2020, I executed the above-identified search warrant, 2:20-sw-0617 AC

4 (E.D. Cal.), for the Instagram accounts by serving it to Facebook, Inc. (the owner of Instagram) via their

5 Online Request System.

6       19.    On August 3, 2020, I received emails from Facebook Records indicating the records were

7 ready to be downloaded from their Online Request System.  On August 5, 2020, I downloaded the

8 digital search warrant results, burned them onto a CD and booked them into USPIS evidence.

9       20.    On August 5, 2020, I began reviewing the records provided by Facebook for the

10 Instagram account for hopelyn_x0x and itsmarcus_betch and located several photos, videos and

11 messages related to counterfeit mail keys, possession of firearms, Ausk's mail theft scheme, Ausk's

12 current identity theft/bank fraud scheme.  Additionally, several photos, videos and messages were

13 recovered regarding possession of large amounts of U.S. currency without an established legitimate

14 source.

15       21.    On September 9, 2020, I and other USPIS agents executed above identified search

16 warrants (2:20-SW-0779 KJN through 2:20-SW-0783 KJN (E.D. Cal)) at Ausk and Griffin's residence

17 at 832 Sullivan Avenue in Stockton, California, related to Ausk's and Griffin's identity theft scheme.

18 During the search, we located additional evidence regarding mail theft, identity theft, and bank fraud

19 including mail in other people's names, access devices in other people's names, receipts for use of

20 access devices, and a large amount of U.S. currency (over $20,000).

21       22.    On September 9, 2020, I began listening to recorded inmate calls from the Sacramento

22 County Jail made by Ausk.  It is my understanding that during these calls inmates are informed that the

23 calls are recorded.  On September 17, 2020 at 3:23PM, Ausk made a phone call to telephone number

24 209-227-9371 and spoke to Griffin.  I recognized Griffin's voice from previous interactions.  Below is a

25 transcription of part of that conversation:

26 / / /

27 / / /

28 / / /

| | Hope: | *Delete Everything* |
|---|---|---|
| | Marcus: | *I already know, I already know.* |

23. On September 20, 2020 at 9:50PM, Ausk made a phone call to telephone number 925-890-8618 and spoke to "Marco".  Below is a transcription of part of that conversation:

| | Marco: | *If it's anything about me, I haven't had contact with you in a long time* |
|---|---|---|
| | Hope: | *What I'm saying is when I got hit, they asked about multiple people* |
| | Marco: | *Did they ask about me?* |
| | Hope: | *Yes, I just don't want to say anything over the phone. All I'm saying is just delete, make new everything, Facebook, Instagram everything, whatever you have, make a new one, delete it…because they got everything off my Facebook* |
| | Marco: | *Alright, you know, I'm not really doing anything like that, so they can go on as much as they want really.  I actually, you know clean you know. I'm in good standing with my PO.* |

24. On September 22, 2020 at 9:01PM, Ausk made a phone call to telephone number 209-227-9371 and spoke to Griffin.  Below is a transcription of part of that conversation:

| | Hope: | *Who else has gone to jail, over, you know* |
|---|---|---|
| | Marcus: | *I don't know* |
| | Hope: | *That's weird cuz you know how I had my mom call Marco and ask if he knows anything about this.* |
| | Marcus: | *Yeah* |
| | Hope: | *Well he told my mom that hella people are going to jail for this.* |
| | Marcus: | *They aint fucking pulling no shit like that out of my phone* |
| | Hope: | *All I'm saying is be careful, be ready cuz they're getting into our phones* |
| | | *That's why I said delete your Facebook, delete everything and make a new one because they put a stop on mine, mine can't be deleted or don't even delete yours just don't use it and get a different one.* |
| | Marcus: | *I'm gonna delete it.* |
| | Hope: | *Huh?* |
| | Marcus: | *Yeah I'm gonna delete it.* |
| | Hope: | *You have to, I'm telling you.* |
| | Marcus: | *Alright.* |
| | Hope: | *Really everybody that we talk to needs to, but how can you say that without it sounding weird.* |
| | | *Because they already got into your messages.* |
| | Marcus: | *What messages?* |
| | Hope: | *Facebook* |
| | | *Anyone you talked to about anything they're coming after.* |
| | Marcus: | *Hold on, I'm trying to delete it.* |

25.     On September 27, 2020 at 1:55PM, Ausk made a phone call to telephone number 209-227-9371 and spoke to Griffin.  Below is a transcription of part of that conversation:

| | |
|---|---|
| Hope: | *Is my Facebook still up?* |
| Marcus: | *I don't know. No it's not* |
| Hope: | *My Facebook got deleted?* |
| Marcus: | *I don't know about deleted, no, it's still up.* |
| Hope: | *Okay well that's what I'm asking, because then you should save those messages that me and Paul had the night before the house got hit.* |
| Marcus: | *Yeah, they probably delete them...(inaudible)* |
| Hope: | *What?* |
| Marcus: | *I said he probably deleted cuz that's what he did with the messages he sent me* |
| Hope: | *Mmmm* |
| | *Well I think I screenshotted them, so* |
| Marcus: | *Yeah, yeah* |

26.     On September 28, 2020 at 1:55PM, Ausk made a phone call to telephone number 209-227-9371 and spoke to Griffin.  Below is a transcription of part of that conversation:

| | |
|---|---|
| Marcus: | *What email did you use to sign into your Facebook?* |
| Hope: | *Hopeylynn@gmail* |
| Marcus: | *Okay, I got everything* |
| Hope: | *Yeah my passwords the same it's never changed from that from there at least* |

27.     Based on my training and experience, I believe the above conversations indicate that the identified Facebook accounts for Ausk and Griffin contain information they do not want to be discovered by law enforcement. Additionally, I believe that the identified Facebook accounts likely contain additional evidence of Ausk and Griffin's schemes, specifically private messages, photos, videos, and posts, shared with each other and/or other coconspirators regarding their criminal activity, as well as location information associated with this data that may show the location of the user at the time of alleged criminal activity.  For example, I have previously observed incriminating messages, photos, videos, and posts on Ausk and Griffin's Instagram accounts, which is social-media platform similar to that of Facebook.

28.     Based on my training, experience, and conversations with other law enforcement officers, it is common for mail and ID thieves to utilize social media to facilitate their illegal activities, including selling fraudulently attained merchandise, stolen access devices, and victim PII.  It is also common for coconspirators to use their social media accounts to communicate with each other.  More specifically, coconspirators often use the private messenger feature of their social media accounts to communicate

1  with other mail and ID thieves and discuss their criminal activity.  It is also common for criminals and

2  coconspirators to use social media to boast about and flaunt the success and fruits of their illegal

3  conduct.

4         29.   From my review of publicly available information provided by Facebook about its

5  service, including Facebook's "Privacy Policy," I am aware of the following about Facebook and about

6  the information collected and retained by Facebook.

7        30.   Facebook owns and operates a free-access social networking website of the same name

8  that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with

9  Facebook, and users can then use their accounts to share written news, photographs, videos, and other

10  information with other Facebook users, and sometimes with the general public.

11        31.   Facebook asks users to provide basic contact and personal identifying information to

12  Facebook, either during the registration process or thereafter.  This information may include the user's

13  full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including

14  city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

15  Facebook also assigns a user identification number to each account.

16        32.   Facebook users may join one or more groups or networks to connect and interact with

17  other users who are members of the same group or network.  Facebook assigns a group identification

18  number to each group.  A Facebook user can also connect directly with individual Facebook users by

19  sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then

20  the two users will become "Friends" for purposes of Facebook and can exchange communications or

21  view information about each other.  Each Facebook user's account includes a list of that user's

22  "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile

23  changes, upcoming events, and birthdays.

24        33.   Facebook users can select different levels of privacy for the communications and

25  information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook

26  user can make information available only to himself or herself, to particular Facebook users, or to

27  anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can

28  also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook

1  accounts also include other account settings that users can adjust to control, for example, the types of

2  notifications they receive from Facebook.

3      34.    Facebook users can create profiles that include photographs, lists of personal interests,

4  and other information.  Facebook users can also post "status" updates about their whereabouts and

5  actions, as well as links to videos, photographs, articles, and other items available elsewhere on the

6  Internet.  Facebook users can also post information about upcoming "events," such as social occasions,

7  by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to

8  particular locations or add their geographic locations to their Facebook posts, thereby revealing their

9  geographic locations at particular dates and times.  A particular user's profile page also includes a

10  "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and

11  links that will typically be visible to anyone who can view the user's profile.

12      35.    Facebook allows users to upload photos and videos, which may include any metadata

13  such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users

14  the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a

15  photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For

16  Facebook's purposes, the photos and videos associated with a user's account will include all photos and

17  videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by

18  any user that have that user tagged in them.

19      36.    Facebook users can exchange private messages on Facebook with other users.  Those

20  messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on

21  the Facebook profiles of other users or on their own profiles; such comments are typically associated

22  with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users

23  to send and receive instant messages through Facebook Messenger.  These chat communications are

24  stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and

25  although Facebook does not record the calls themselves, it does keep records of the date of each call.

26      37.    If a Facebook user does not want to interact with another user on Facebook, the first user

27  can "block" the second user from seeing his or her account.

28  / / /

38.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

39.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

40.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

41.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

42.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

43.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

44.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or

complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

45.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

/ / /

46.     Therefore, the computers of Facebook are likely to contain the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

### INFORMATION TO BE SEARCHED AND ITEMS TO BE SEIZED

47.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular Title 18, United States Code, Sections 2703(a), (b)(1)(A), and (c)(1)(A), by using the warrant to require Facebook, Inc. to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

48.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of violations, or attempted violations, of 18 USC § 1708 – Possession of Stolen U.S. Mail; 18 USC § 1704 – Possession of Stolen or Counterfeit Postal Keys or Locks; 18 USC § 1028A – Identity Theft; 18 U.S.C. § 1341/43 – Mail and Wire Fraud; 18 USC § 1344 – Bank Fraud; Title 18 § 922(g) – Felon in Possession of a Firearm may be located in the SUBJECT ACCOUNTS described in Attachment A.

49.     Based on the forgoing, I request that the Court issue the proposed search warrant.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

50.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Facebook.  Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

/s/Elizabeth Foley (signed electronically)
Elizabeth Foley
Postal Inspector
United States Postal Inspection Service

Subscribed and sworn to before me
telephonically on:                    10/9/2020

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

Approved as to form by SAUSA ROBERT J. ARTUZ

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook accounts with the following usernames and/or IDs:

Username HopelynAusk123116; ID 100004164905535

Username marcus.griffin; ID 100006739772423

(the "accounts" or "subject accounts") that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., a social-media company headquartered in Menlo Park, California.

The information for the accounts should include account information preserved pursuant to preservation requests served on Facebook on September 18, 2020, and any new account information created subsequent to any preservation.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Facebook, Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, Inc., including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, Inc., or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook, Inc. is required to disclose the following information to the government for each account listed in Attachment A:

a.      All identity and contact information, including full name, e-mail address, physical address (including city, state, and zip code), date of birth, phone numbers, gender, hometown, occupation, and other personal identifiers;

b.      All past and current usernames associated with the accounts;

c.      The dates and times at which each account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

d.      All activity logs including IP logs and other documents showing the IP address, date, and time of each login to the accounts, as well as any other log file information;

e.      All information regarding the particular device or devices used to login to or access the account, including all device identifier information or cookie information, including all information about the particular device or devices used to access the account and the date and time of those accesses;

f.      The identity of any other accounts accessed by the same device that accessed the subject accounts, including accounts linked by machine cookies, and the identity of any other accounts that are registered with the same email addresses or telephone numbers as the subject accounts;

g.      All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

h.      All communications or other messages sent or received by the account from January 17, 2019, to Present;

i.      All user content created, uploaded, or shared by the account, including any comments made by the account on photographs or other content January 17, 2019, to Present;

j.      All photographs and images in the user gallery for the account January 17, 2019, to Present;

k.      All location data associated with the account, including geotags January 17, 2019, to Present;

l.      All data and information that has been deleted by the user January 17, 2019, to Present;

m.      A list of all of the people that the user follows on Facebook and all people who are following the user (*i.e.*, the user's "following" list and "followers" list), as well as any friends of the user;

n.      A list of all users that the account has "unfollowed" or blocked;

o.      All privacy and account settings;

p.      All records of Facebook searches performed by the account, including all past searches saved by the account January 17, 2019, to Present;

q.      All information about connections between the account and third-party websites and applications; and,

r.      All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services, and all records of actions taken, including suspensions of the account.

Facebook, Inc. is hereby ordered to disclose the above information to the government within **14 DAYS** of issuance of this warrant.

### II.    **Information to be seized by the government**

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 1708 – Possession of Stolen U.S. Mail; 18 U.S.C. § 1704 – Possession of Stolen or Counterfeit Postal Keys or Locks; 18 U.S.C. § 1028A – Identity Theft; 18 U.S.C. § 1341/43 – Mail or Wire Fraud; 18 U.S.C. § 1344 – Bank Fraud; 18 U.S.C. § 922(g) – Felon in Possession

of a Firearm, involving Hopelyn Ausk or Marcus Griffin since January 17, 2019, including, for each account identified on Attachment A, information pertaining to the following matters:

(a) Evidence of mail theft, mail/wire fraud, identity theft, bank fraud, and illegal firearm possession;

(b) Evidence indicating how and when each Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating each Facebook account owner's state of mind as it relates to the crimes under investigation;

(d) The identity of the person(s) who created or used each user ID, including records that help reveal the whereabouts of such person(s);

(e) The identity of the person(s) who communicated with each user ID about matters relating to mail theft, mail fraud, ID theft, bank fraud, and illegal firearm possession, including records that help reveal their whereabouts;

(f) Communications between or among coconspirators or coschemers regarding the crimes under investigation;

(g) Photographs, images, and videos of firearms, firearm parts, and ammunition;

(h) Photographs, images, and videos of U.S.P.S. keys, locks, key codes, or other property;

(i)  Photographs, images, and videos of victim U.S. Mail, bankcards, access devices, government-issued IDs, personally identifiable information, and other identification documents;

(j)  Photographs, images, and videos of large amounts of U.S. currency;

(k)  Photographs, images, and videos of merchandise;

(l)  Documentation evidencing the purchase of any goods, services, or merchandise through bank/wire fraud, identity theft, or access device fraud; and

(m) All location information.

# ATTACHMENT C

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

**Sep 03, 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No.    2:20-mj-0134 KJN |
| | ) | |
| HOPELYN RHIANNON AUSK | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, U.S. Postal Inspector Elizabeth Foley the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ September 2019 _____ in the county of _____ San Joaquin County _____ in the _____ Eastern _____ District of _____ California _____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1344 | Bank Fraud |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

/s/ Elizabeth Foley

*Complainant's signature*

Elizabeth Foley
U.S. Postal Inspector
United States Postal Inspection Service

*Printed name and title*

Sworn to before me and signed telephonically.

Date: _____ September 3, 2020 _____

City and state: _____ Sacramento, California _____

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT AND SEARCH WARRANTS

I, Elizabeth Foley, being duly sworn, depose and state the following:

### PURPOSE

1.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search and seize evidence, fruit, and/or instrumentalities of certain offenses as described in Attachment B, at the following locations, vehicles, and persons in the Eastern District of California, as more fully described in Attachments A-1 through A-5:

    a.  823 Sullivan Avenue, Stockton, California 95205, as further described in Attachment A-1;

    b.  2016 Grey Mercedes Benz sedan with California license plate 7WXB415, as further described in Attachment A-2;

    c.  a red Dodge Challenger with a double silver racing stripe running down the center of the vehicle, as further described in Attachment A-3;

    (hereinafter, the "Premises");

    d.  HOPELYN RHIANNON AUSK (date of birth XX/XX/1996), as further described in Attachment A-4;

    e.  MARCUS WINSTON GRIFFIN (date of birth XX/XX/1991), as further described in Attachment A-5;

    (hereinafter, the "Subjects").

2.  I also make this affidavit in support of a criminal complaint and arrest warrant for HOPELYN RHIANNON AUSK (date of birth XX/XX/1996) for a violation of 18 U.S.C. § 1344 – Bank Fraud.

### INTRODUCTION AND AGENT BACKGROUND

3.  I am a Postal Inspector and have been so employed since February 2017. Currently, I am assigned to the San Francisco Division of the United States Postal Inspection Service (USPIS), and I work out of the Stockton office. During my tenure, I completed training at

1

the United States Postal Inspection Service Academy in Potomac, MD. As a part of my official duties, it is my responsibility to investigate violations of federal and state law, including robbery and burglary of postal facilities, destruction of government property, theft of U.S. Mail, possession of stolen U.S. Mail, mail and bank fraud, credit card fraud, identity theft, and counterfeit personal checks and identifications. As a U.S. Postal Inspector, I have participated in numerous criminal investigations relating to theft of U.S. Mail, counterfeit personal and corporate checks, possession of stolen U.S. Mail, credit application fraud, bank fraud, identity theft, and counterfeit identifications.

4.      The facts and conclusions in this affidavit are based on my personal knowledge gained from my participation in this investigation, my training and experience, and information gained from other inspectors, agents, local law enforcement, and field contacts and reports. Since this affidavit is submitted for the limited purpose of obtaining search and arrest warrants, I have not included all of the facts of which I am aware in this investigation.

5.      Where statements made by other individuals are referenced in this Affidavit, such statements are described in sum and substance and in relevant parts only. Similarly, where information contained in reports and other documents or records is referenced in this Affidavit, such information is also described in sum and substance and in relevant parts only.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Ausk and Griffin have violated or aided and abetted violations of 18 U.S.C. § 371 – Conspiracy; § 1708 – Possession of Stolen U.S. Mail; § 1704 – Possession of Stolen or Counterfeit Postal Keys or Locks; § 1028A – Identity Theft; § 1344 – Bank Fraud; § 1341 –Mail Fraud; § 922(g) – Felon in Possession; and 26 U.S.C. § 5861 – Possession of an Unregistered Firearm. Further, there is probable cause to believe that evidence, fruit, and/or instrumentalities of these violations are currently to be found at the locations in Attachments A-1 through A-5.

7.    The USPIS is investigating a criminal scheme that began at a time unknown to the United States but at least starting on or about January 2019 and is currently on-going, wherein the Subjects devised a material scheme to defraud, and attempt to defraud, federally insured financial institutions. The Subjects executed and aided and abetted the scheme by obtaining, rifling, profiling, and altering identification and financial information from stolen U.S. Mail and from other stolen property containing identification and financial information. The Subjects catalogued, saved, and possessed the stolen mail and property. In processing the stolen mail and property, the Subjects targeted certain postal customers and mail receptacles utilized by those customers (postal victims). The Subjects further executed the scheme by posing as identity-theft victims to open and use several bank accounts in the victims' names.

## STATEMENT OF PROBABLE CAUSE

### Overview

8.    In May 2020, I received information from Stockton Police Department (SPD) Detective Ashlyn Hulse regarding an investigation into Ausk and Griffin. The information indicated that Ausk was found in possession of U.S. Mail in the names of others, counterfeit postal keys, and postal locks during a probation search of Ausk and Griffin's residence, who were boyfriend and girlfriend.

9.    On May 27, 2020, SPD arrested Ausk on a state arrest warrant during a traffic stop near her residence. During the arrest, Griffin left the residence and arrived at the scene on foot as Ausk's Mercedes was being towed. Griffin was found to be on Post Release Community Supervision (PRCS) with Contra Costa County Probation, which included search conditions of his residence. Law enforcement later conducted a PRCS search of Ausk and Griffin's shared residence located at 529 N. Monroe #6 in Stockton, California.

10.   The search of the residence yielded: an unregistered Kel-Tec 9mm Luger firearm, an extended magazine for a Glock pistol, a full-auto selector switch for Glock pistol, several rounds of three different calibers of ammunition, several pieces of mail that did not belong to Ausk or Griffin, Economic Impact Payment Checks (U.S. stimulus checks) in

3

names other than Ausk and Griffin, notebooks containing personally identifiable information (PII), counterfeit U.S. Postal Service keys, U.S. Postal Service locks, credit cards, and several presumed stolen packages.

11.     SPD arrested Ausk on the following charges: PC 532(A) – Obtaining Money/etc. by False Pretenses; PC 484E(D) – Use Access Account Info W/O Consent; PC 530.5(c)(1) – Possession of Personal ID W/Intent to Defraud; PC 32310 – MFG/Sale/ETC Large Capacity Magazine; PC 484E(A) – Sell/ECT Lost/ECT Access Card; PC 32900 – MFG/ETC Multiburst Trigger; PC 25850(C)(6) – Carrying a Loaded Firearm Not the Registered Owner; PC 484G – Theft By Use of Access Card Data (2 counts).

12.     SPD determined that Griffin was a convicted felon and was arrested on the following charges:  PC 29800(A)(1) – Felon in Possession of a Firearm; PC 32310 – MFG/Sale/ETC Large Capacity Magazine; PC 25850(C)(6) – Carrying a Loaded Firearm Not the Registered Owner; PC 32900 – MFG/ETC Multiburst Trigger; PC 30305(A)(1) – Prohibited Person Own/Possess/ETC/ Ammunition; PC 466 – Possession of Burglary Tools.

13.     On May 29, 2020, I located an Instagram account with the username "hopelyn_x0x", which I believe was operated by Hopelyn Ausk based on the following facts: (1) the profile photo matched Ausk's photos in her California Department of Motor Vehicle records and (2) the profile name "Hopelyn Ausk" matched Ausk's true name. Ausk's profile also listed "BabyDaddy" with the associated username, "itsmarcus_betch." I understand this to mean that the father of Ausk's child is a person with this Instagram username.

14.     I believe the Instagram account with the username "itsmarcus_betch" was operated by Marcus Griffin based on the following facts: (1) the profile photo matched Griffin's photos in his California Department of Motor Vehicle records (2) the name "marcus" appears within the username, and (3) Ausk and Griffin were living together at the time of the above-described search.

15.     In furtherance of the investigation, I began monitoring these publicly-available Instagram accounts. On July 7, 2020, I submitted a preservation request for the aforementioned accounts to Facebook, Inc.

16.     In a filed Affidavit for search warrant 2:20-SW-0617-AC (E.D. Cal.), I established there was probable cause to believe Hopelyn Ausk and Marcus Griffin possessed stolen mail, counterfeit postal keys, committed identity theft and bank fraud. Additionally, there was probable cause to believe the Instagram accounts for user hopelyn_x0x and itsmarcus_betch contained evidence of mail theft, identity theft, bank fraud, and possession of an unregistered firearm (aka a "ghost gun") including, without limitation, photographs, messages, and other records.

### Stockton Police Department Report 19-47268

17.     On January 17, 2019, victim R.M. reported to law enforcement the theft of vehicle loan paperwork during a burglary of a vehicle in Walnut Creek, CA.

18.     On April 26, 2019, victim R.M. reported the theft of a Discover card ending in x0298 that was never received in the mail and was subsequently used without authorization. According to Discover records, there were 28 transactions made between January 27, 2019, and February 4, 2019, totaling $2,662.98. The majority of the transactions occurred in Stockton, CA. There were two Automated Number Identifiers (ANI) identified in the records. One ANI came back to phone number 209-406-8531. SPD determined this number was listed in their records management system as having been used by Hopelyn Ausk.

19.     Law enforcement identified a transaction from February 4, 2019, on card x0298's account for Safelite. Law enforcement conducted a public search for the transaction on the Safelite website and located a work order for "Hope Maricq" for $253.99, which was placed with card x0298 on February 6, 2019. The order also listed a Mercedes with CA license plate 8ELU386. I confirmed through California DMV records that plate 8ELU386 was registered to Hopelyn Rhiannon Ausk.

/ / /

**Stockton Police Department Report 19-42103**

20.     In September 2019, victim S.S. reported to law enforcement that he/she did not receive a

pre-paid Bank of America debit card (ending in x5657) in the mail from California

Employment Development Department (EDD). On October 2, 2019, law enforcement

spoke to victim S.S. and found the card was used between July and September 2019 for

over $12,000 in transactions at various locations in Stockton, CA. Detective Hulse

located purchases from Louis Vuitton made on July 26, 2019, with card x5657 and

contacted customer service for more information. She located one Louis Vuitton online

order (No. NX42071140) for the purchase of multiple wallets totaling $2,120.70 using

the card. S.S's billing address was used for the transaction, but the merchandise was

shipped to "Hope Ausk" at 529 N Monroe #6 Stockton CA.

21.     In October 2019, SPD obtained still shots of a female resembling Ausk using card x5657

at a Safeway store in Stockton, California, on September 2, 2019, for $426.95 in

transactions. Surveillance video also captured footage of a black Mercedes in the parking

lot.

22.     On June 12, 2020, Detective Hulse obtained a Search Warrant for JSD Supply for all

account and invoice information related to Hopelyn Ausk and card ending x5657. JSD

was a gun parts supplier based in Pennsylvania, which sells, among other things, "80%

firearms" that can be shipped all of the country for assembly into a 100% firearm. On

June 26, 2020, Detective Hulse received search warrant results that indicated a successful

purchase was made July 31, 2019, for $257.98 to card x5657. The transaction was for

two items: 1-"80% P320 Compatible Insert-MUP 1" and 1-"Jig for 80% P320

Compatible Insert-MUP 1." Based on my training, experience and conversations with

other law enforcement officers, these items can be used to manufacture a 100% firearm.

According to the website JSDSupply.com, the 80% P320 Compatible Insert-MUP 1

(Modular Universal Pistol) is a part used as a base to manufacture a pistol-type firearm.

The insert lacks all holes and the recipient must bend the slide rails and trim rails to size

for it be operational within a firearm. The Jig for the 80% P320 Compatible Insert-MUP

1 is a "jig kit", which includes a tool used as a template for drilling holes, and bending and trimming side rails. The kit also includes the needed drill bits.

23. At the times of the above x5657 card transactions, Bank of America was a financial institution insured by FDIC.

24. According to results received from Facebook for search warrant 2:20-SW-0617-AC (E.D. Cal.), on June 9, 2019, Instagram user hopelyn_x0x posted the below photo that depicts what appears to be photos of gun parts with the words "Processing." User hopelyn_x0x commented, "What can I say #imspolied #treatyaselfdontcheatyaself #glock17." User martythegod then replied, "Wait so you can just order this shit like that. And build your own gun. If soon send me the info I'll take 3 of everything tonight tapin ASAP k."



25. On September 6, 2019, Instagram user hopelyn_x0x posted the below photo that depicts someone who appears to be a female holding a firearm in her lap. The user commented, "Finally done building        #Glock #ghostgun #g17 #glock17 #p80build #p80 #polymer80 #gen3 #glockgen3."  User itsmarcus_betch replied, "Done* & ur welcome." User hopelyn_x0x replied, "@itsmarcus_betch thanks baby 😋😊   .."



26.     I also located the following direct messages between Instagram user hopelyn_x0x and

user lileddie1414 from September 23, 2019, regarding building a firearm:

> **Text** *Ask ur man if he bought the whole set up and how much was it*
> **Author** lileddie1414
>
> **Text** *Cuz I got the same gun but want to build my own*
> **Author** lileddie1414
>
> **Text** *That's my gun not his, I bought it yes as a whole kit only thing it didn't come with was a clip*
> **Author** hopelyn_x0x
>
> **Text** *Oh ok ma how much u get the whole set up for*
> **Author** lileddie1414
>
> **Text** *399 of Jsd supply*
> **Author** hopelyn_x0x
> **Text** *He didn't buy it for me, he just helped me drill a few holes lol*
> **Author** hopelyn_x0x
>
> **Text** *That's for shure a win what did u need to get it did u just but it do they do back ground or any thing*
> **Author** lileddie1414
>
> **Text** *No it's a ghost gun you just add to cart pay for it and get it and build it*
> **Author** hopelyn_x0x
>
> **Text** *Midwayusa has some to but pay attention on that sight a lot of them don't come in a complete kit so you gotta add all the pieces for gun in your cart but jsd has Glock kits*

*and sig kits, I just bought a Glock 27 off jsd to buil*
**Author** hopelyn_x0x

**Text** *Okok yea I know it's a ghost just diffrent know about the whole buying it process. Yea I notice tht u gotta be careful look in discription make shure everything there. That's*
*dope pretty easy right to build? U just need a dremel?*
**Author** lileddie1414

**Text** *Yeah it comes with a jig and it tells you on this jig that the lower sits in what to cut off and drill there is one part inside the lower that you probably will be confused by cuz the slide won't fit right just hit me once you get to that point and I'll tell you what to do cuz it doesn't say to do this but YOU HAVE to to get the slide on, but just look on YouTube the first one a bought we drilled the holes by hand and the last 3 we did with a dremal also brownell is a site I believe that has kits too and gunbroker*
**Author** hopelyn_x0x

**Text** *Im ma check em out but u said u got urs from jsd supply right*
**Author** lileddie1414

**Text** *Yeah jsd is where you will seriously find the best deal*
**Author** hopelyn_x0x

**Text** *For shure .where u get the clip ma*
**Author** lileddie1414

**Text** *I got it from midway USA, but your not aloud 24 and 33 round ones here so I ordered a 10 round that came to our house then ordered a 24 and 33 sent to my dads in Texas then had it reroutes to my house in Stockton lol*

27.     As shown above, it appears that Ausk stated on Instagram that Griffin, a convicted felon, helped her build an unregistered firearm in California. AUSK also stated she bought a Glock 27 from JSD to build. According to SPD Report 19-42103 (Related to Walnut Creek Police Department Courtesy Report 19-29041), victim S.S. reported she was a victim of mail theft wherein she never received her California Employee Development Department (EDD) pre-paid debit Bank of America card ending in x5657 in the mail. A transaction using card ending x5657 was located for JSD Supply, a gun parts manufacturer, using card x5657 on July 31, 2019 in the amount of $258.57. The merchandise was shipped to Hope Ausk at 529 N Monroe #6 in Stockton, CA.

28.     According to results received from Facebook for search warrant 2:20-SW-0617-AC (E.D. Cal.), on November 16, 2019, Instagram user hopelyn_x0x posted the below photo with

the comment "HMU #forsale #louisvuitton message me privately for price! Serious buyers only please."



29.   I located the following direct messages between user hopelyn_x0x and user devenrenaeee from November 17, 2019, regarding the posted Louis Vuitton item for sale:

> **Text** *What's good with the bag, How much?*
> **Author** devenrenaeee
>
> **Text** *850*
> **Author** hopelyn_x0x
>
> **Text** *comes with the Louis Vuitton box and cloth bag it came in and I have the email recipient fro When I got it from the Louis Vuitton store last month*
> **Author** hopelyn_x0x
>
> **Text** *What are the dimensions? Can you send me a few more photos*
> **Author** devenrenaeee

30.   In the Instagram direct messages to user devenrenaeee, AUSK provides a photo of a receipt of a purchase of a similar Louis Vuitton product. The shipping address correlates

with AUSK's name and previous address in Stockton, and the billing information is listed as victim S.S. and S.S's address in Walnut Creek.



**Author** hopelyn_x0x

**Text** *Look up that purse*
**Author** hopelyn_x0x

31.    Based on my training, experience, and conversations with other law enforcement officers, it is common for individuals who fraudulently purchase merchandise to use social media platforms to attempt to sell the merchandise at discounted prices for profit.

### Stockton Police Department Report 19-51927

32.    On December 10, 2019, SPD arrested Ausk on a warrant obtained from the previous law enforcement investigation related to the theft of a Discover card ending in x0298, and Bank of America card ending in x5657. During a search incident to arrest, SPD found her in possession of several pieces of likely stolen mail, two likely stolen credit cards, and several shaved keys that appeared to be counterfeit postal keys.

33. One of cards Ausk possessed was a Home Depot credit card ending x6065. SPD spoke with mail-theft victim V.E. who stated he/she had applied for a Home Depot credit card, but never received it. Law enforcement determined that V.E. was supposed to receive card ending x6065. After V.E. requested and received a new card, he/she also received a statement showing approximately $1,400 in transactions that had already been made to the account. The transactions occurred between October 27, 2019, and December 3, 2019.

34. Law enforcement obtained surveillance video from Home Depot of a transaction on November 12, 2019, wherein a female resembling Ausk made a purchase of $489.30 of what appeared to be mostly Christmas decorations using card ending x6065.

35. According to results received from Facebook for search warrant 2:20-SW-0617-AC (E.D. Cal.), messages between Instagram user hopelyn_x0x and user ssunnydawn were located from November 12, 2019, wherein hopelyn_x0x asked ssunnydawn if they wanted anything from Home Depot. The users made the following exchange:

**Text** *Hey do you want anything from homedepot I have a credit card and need to make money for Marcus lawyer*
**Author** hopelyn_x0x

**Text** *Christmas lights N decorations*
**Author** ssunnydawn

**Text** *White outdoor Fake tree*
**Author** ssunnydawn

**Text** *How many ? And how big of a tree I'll go get it now. And I can come drop it off and grab the cash from you I. A few hours*
**Author** hopelyn_x0x

36. Of the several pieces of mail found in Ausk's possession, four pieces of mail were addressed to T.A. at 549 N. Monroe Ave, #6 in Stockton, CA from Discover, Capital One, Synchrony Bank and First Premier Bank. One mail piece was addressed to N.B. at 549 N. Monroe Ave, #6 in Stockton, CA. One mail piece from Citibank was addressed to M.A. at 549 N. Monroe Ave, #6 in Stockton, CA.

37.   Law enforcement interviewed victim N.B. who stated they received letters in the mail for credit cards for which he/she did not apply. N.B. also received at least two credit cards in the mail for which he/she did not apply. N.B. opened the mail piece addressed to N.B. found in Ausk's possession and found it contained a denial letter from Bank of America.

38.   Law enforcement interviewed victim M.A. who was reported to be the grandmother of Ausk, but had not seen Ausk in several years. According to M.A., she went to Japan from April 2019 to July 2019. Upon her return, she found several credit card denial letters she knew she had not applied for and disregarded the letters.

39.   During a check of postal records, I located a temporary Change of Address for M.A. from her residence in Concord, California, to Ausk's address at 529 N Monroe St. Apt 6 in Stockton, California. The Change of Address was scheduled to begin April 27, 2019 and end June 27, 2019.

40.   During an interview following her arrest, Ausk stated to law enforcement she lived alone.

41.   Law enforcement reviewed inmate phone calls made by Ausk while she was in custody. On December 13, 2019, Ausk made a call to phone number 925-315-0022. The receiver of the call used a second call to allow Ausk to speak to "Marcus." Below is an unofficial transcript of that conversation:

> Marcus: *"If they found anything in the car it's just a misdemeanor."*
> Hope: *"Possibly not... well if there isn't a bag of 9 keys on the podium then they have that. They're all for the same city. They possibly got the San Ramon stuff."*
> Marcus: *"The charges you have said would not have gone with what they found."*

42.   On December 15, 2019, Ausk made a call to phone number 925-315-0022. The receiver of the call used a second call to allow Ausk to speak to "Marcus."  Below is an unofficial transcript of that conversation:

> Marcus: *"You didn't get caught with anything right?"*
> Hope: *"Might of... 9 of the San Ramon things were in there. Marcus think about it. Isn't those things federal? They were in a bag. Probably in my purse."*
> Hope: *"If they offer me 8 months I think I should take it."*

/ / /

/ / /

**Stockton Police Department Report 20-14761**

43.     On April 26, 2020, victim P.T. reported a fraudulent charge in the amount of $1965.60 to

his/her Bank of America bank account to AT&T with the description

"ATTDESID:XXXXX2004SMT2CINDN: HOPELYN AUSK CO

IDXXXXX31005WEB." P.T. recognized the name HOPELYN AUSK as a former tenant

of an owned tri-plex at 1018 N. Commerce Street in Stockton, California, and knew Ausk

had the banking information based on Ausk's previous use of that account for direct

deposit of rent.

44.     Law enforcement submitted a search warrant to AT&T and found the charge was

associated with Ausk. The telephone number on the AT&T account was 209-981-9270,

which was activated on December 17, 2019, and associated with the name "Hopelyn

Ausk."

45.     The name of victim H.P. was also associated to the AT&T account and phone number

209-981-9270. Law enforcement interviewed H.P. and found he/she did not have an

AT&T phone or television account. H.P. reported they had received at least nine different

unauthorized credit cards opened in his/her and or his/her spouse's name to include TJ

Maxx, Target, JC Penny, Nordstrom, Citibank, Indigo, Chevron, Home Depot and Apple

that were not authorized. A report was also filed with San Ramon Police Department

(Report 20-843).

46.     Victim H.P.'s date of birth, social security number and email address were located in a

notebook found in Ausk and Griffin's residence during the May 27, 2020, search

described above (SPD Report 20-20643).

**Stockton Police Department Report 20-20643**

47.     On May 27, 2020, Ausk was arrested by local law enforcement on a state arrest warrant

during a traffic stop. Griffin arrived on foot to the traffic stop as Ausk's Mercedes was

being towed. Griffin was found to be on Post Release Community Supervision (PRCS)

with Contra Costa County Probation, which included search conditions of his residence.

Law enforcement later conducted a PRCS search of Ausk and Griffin's shared residence located at 529 N Monroe #6 in Stockton, California.

48.     The search of the residence yielded: an unregistered Kel-Tec 9mm Luger firearm, an extended magazine for a Glock pistol, a full-auto selector switch for Glock pistol, several rounds of three different calibers of ammunition, several pieces of mail that did not belong to Ausk or Griffin, Economic Impact Payment Checks (U.S. stimulus checks) in names other than Ausk and Griffin, notebooks containing personally identifiable information (PII), counterfeit U.S. Postal Service keys, U.S. Postal Service locks, credit cards, and several presumed stolen packages.

49.     PII including date of birth, social security number and address for victim B.T.; G.A; and a Confidential Victim were located in the notebooks found in Ausk and Griffin's residence. Law enforcement interviewed the victims who each confirmed he/she did not know nor give permission to Ausk and/or Griffin to use their PII.

50.     PII including date of birth, social security number, email address, annual earnings and several phone numbers for victim T.A. were located in a notebook found in Ausk and Griffin's residence. Law enforcement interviewed T.A. and found he/she used to live at 529 N Monroe #6 in Stockton, California, with sibling, victim G.A. T.A. reported recent, unauthorized fraudulent accounts for Fingerhut and Target were opened. The Target account had incurred a $20.00 charge. I understand T.A. to be the same person as T.A. in SPD report 19-51927, wherein mail addressed to Ausk's residence in the name of T.A. was located in Ausk's possession.

#### Other Investigative Steps and Evidence

51.     On June 16, 2020, I received information from Contra Costa County Probation that Griffin reported to them, on or about June 8, 2020, that he resided at 823 Sullivan Ave., Stockton, CA, with his girlfriend Hope and her sister Mariah.

52.     On June 22, 2020, law enforcement conducted surveillance at 823 Sullivan Avenue, Stockton, CA. Both Ausk and Griffin were observed at the 823 Sullivan Ave. residence

and leaving the residence in a black 2008 Mercedes C300, bearing California license plate 8ELU386, which was registered to Ausk.

53.     On July 24, 2020, law enforcement conducted surveillance at the 823 Sullivan Ave., Stockton, residence and observed a red Dodge Challenger with a double silver racing stripe on the top of the vehicle parked in the driveway. On September 1, 2020, law enforcement conducted additional surveillance at the same address and observed Griffin driving the same red Dodge Challenger leave the residence. The vehicle was observed to have no license plate, but a California Temporary Operating permit with the number "8" was posted on the rear window. On September 1, 2020, law enforcement also observed Ausk arrive at the residence in her Mercedes.

54.     During surveillance of the residence on September 1, 2020, law enforcement observed two temporary building structures, similar to a mobile or manufactured home, positioned at the back of the 823 Sullivan Ave property. I reviewed San Joaquin County records showing the land area encompassed by the property at 823 Sullivan Ave. (Parcel No. 155-454-120-000) and confirmed that the observed structures were located within the property boundaries. These structures were separate from a white structure at the front of the house that appeared to be detached garage or storage shed.

55.     On July 17, 2020, law enforcement surreptitiously looked through the garbage in the city trash cans on the curb outside the residence of 823 Sullivan Ave, in Stockton, California. Law enforcement located items of indicia bearing the name "Hope Griffin Ausk" inside the trash cans, including a mailing bubble envelope and invoice from Zulay's Nails. In addition, the following were also located:

- Safco credit denial in the name of "Hope Aust" addressed to 825 Sullivan Ave.;

- Midland Credit Management (Debt Collection) statement addressed to H.D. at 823 Sullivan Ave. for a Synchrony Bank account ending x1483;

- Unopened mail piece addressed to J.L. at 823 Sullivan Ave. from Aaron's;

- Metabank gift card ending in x2156;

- Various food, merchandise, gas, and ATM receipts for bankcards ending x9338, x5746, x7973, 9338, 7796, x5810; and

- A note with the following handwritten:
  Hope: $1400/$325
  CASH APP: $5,855.07
  Current: $4,052
  Paypal: $1,200
  Cash: $2,250
  EDD: $6,098
  Recertify: $13,400
      TOTaL: $24,974

56.   Based on my training and experience, I believe the above-identified, handwritten note was a tally of Ausk and/or Griffin's earnings from criminal activities, including EDD fraud.

57.   On July 17, 2020, law enforcement conducted surveillance at 823 Sullivan Avenue, Stockton, CA. Both Ausk and Griffin were observed at the 823 Sullivan residence and leaving the residence in a grey 2016 Mercedes sedan, bearing California license plate 7WXB415. According to California Department of Motor Vehicle records, the vehicle is registered to Hopelyn R. Ausk.

58.   While reviewing results received from Facebook for search warrant 2:20-SW-0617-AC (E.D. Cal.), I located several messages between user hopelyn_x0x and user eastbaylivinnn from March 1 and March 2, 2020, regarding AUSK's current "hustle," including the following exchange:

**Text** *Fraud, to be honest, I make mailbox keys and mailbox cash checks credit cards ect that's what I had my last case for and I'm currently fighting another one, but I did sell black but there's more money in what I do now, I bought all my cars from fraud. Lol.*
**Author** hopelyn_x0x

**Text** *Kinda I mean you gotta phone so like if you had someone to buy you but coins you could transfer it to the credit card site and buy card numbers and buy shit, but I go get mail out of the cluster boxes that the post man can only open and then I use the cards cash their checks and or open cards in there names and max em out. Lol*
**Author** hopelyn_x0x

In a prior conversation between these individuals, user eastbaylivinnn identified himself as an inmate at Lancaster state prison.

17

59.   As noted above, Ausk was found in possession of counterfeit postal keys during her
      arrest on December 10, 2019, and was found in possession of postal locks and counterfeit
      postal keys on May 27, 2020, following her arrest.

60.   Based on my training and experience, and the training and experience of other law
      enforcement personnel assisting in this investigation, the U.S. Postal arrow locks were
      used in USPS neighborhood mailbox units. Additionally, the counterfeit keys, which
      appear to have been made from the locks, resemble arrow keys that USPS employees use
      to access USPS mailbox units.

61.   According to results received from Facebook for search warrant 2:20-SW-0617-AC (E.D.
      Cal.), on July 12, 2020, user hopelyn_x0x uploaded a video depicting what appears to be
      a female hand dropping a large amount of US Currency on the floor. Another subject
      appears to hand another stack of currency at least five more times. The subject dropping
      the currency was wearing an ankle monitor. On July 13, 2020, user itsmarcus_betch
      commented "So I am guessing that Must be all the money u Saved by switching to
      Geico? Good Job!"  The two screen shots below depict the beginning and end of the
      video:

 

62.   On July 8, 2020, user itsmarcus_betch sent the following messages to user
      er_towing_transporting regarding looking to purchase a vehicle. User itsmarcus_betch
      then sends user er_towing_transporting four photos of a large amount of US Currency.

/ / /

**Text** *Wats up brodi I have been looking for a clean title Dodge Charger scat Pack with low miles preferably under 50K miles but @ most 60K miles if u come across one that has a salvaged title let me know & shoot me a few pictures & ur Price & I'll get back to u*
**Author** itsmarcus_betch

**Text** *Or a Audi A7 coupe with low miles*
**Author** itsmarcus_betch

**Text** *Cadillac CTS-V coupe with low miles*
**Author** itsmarcus_betch

**Text** *Hit me up wen u come across anything chunky*
**Author** itsmarcus_betch



63.     On July 7, 2020, hopelyn_x0x user posted the below photo with the comment, "GPS don't stop me from making money":

**[CONTINUED ON NEXT PAGE]**



64.     On May 24, 2020, user hopelyn_x0x posted the below photo with the comment
"Welcome home to my baby daddy, @itsmarcus_betch late post, but finally outta prison
love you to the moon and back now it's time to get this moneyyyy":



65.     On April 16, 2020, user hopelyn_x0x uploaded a video that depicts someone spreading a
large amount of U.S. currency in their lap and commented, "Video cut off before I was
done (; Coronavirus done my pockets right all y'all Waitin for the stimulus check while
I'm Chasin a check me and my partner are gettin it what you know about thT 😗
#realgoer."  The below screenshot was taken from the video:



66.     On October 18, 2019, user hopelyn_x0x uploaded a video that depicts someone spreading a large amount of U.S. currency in their lap and commented, "  ☺ #dontsleeponit." The below screenshot was taken from the video:



67.     On April 16, 2019, user itsmarcus_betch sent the below photo of several addressed parcels and envelopes messages to user nuttyfahireee with the message "Aye what all can u sell on EBay cause I be hittin on hella shit mailboxing?":

**[CONTINUED ON NEXT PAGE]**



♡ ○ ▽                                          ⬚

**18 likes**

**nuttyfahireee** DOIN IT $$ Back on eBay! All those
packages going out tomorrow.

68.     Based on my training and experience, "mailboxing" is a term used to refer to breaking

        into mail boxes and stealing mail.

69.     Based on my training, experience, and conversations with other law enforcement officers,

        criminals often post photos and videos on social media platforms to flaunt their success in

        obtaining large amounts of cash through illegal sources and fraud schemes. It is common

        for mail and ID thieves to utilize social media to facilitate their illegal activities,

        including selling fraudulently attained merchandise, stolen access devices, and victim PII.

        It is also common for coconspirators to use their social media accounts to communicate

        with each other. More specifically, coconspirators often use the private messenger feature

        of their social media accounts to communicate with other mail and ID thieves and discuss

        their criminal activity. It is also common for criminals and coconspirators to use social

        media to boast about and flaunt the success and fruits of their illegal conduct.

70.     Law enforcement conducted a records check on Ausk and Griffin with the EDD[1] of the

        State of California. Law enforcement obtained information from EDD indicating that

        Ausk had not reported income with the State of California since the first quarter of 2019,

        and Griffin had not reported any income to the State of California. However, according to

        several recent postings on Ausk and Griffin's social media accounts, they displayed large

---

[1] The query of the California Employment Development Department records covered the last
five quarters prior to current fiscal year, and was conducted using Ausk and Griffin's social
security numbers.

amounts of U.S. currency. I have been unable to establish a legitimate source of income for Ausk and Griffin.

71.     While reviewing results received from Facebook for search warrant 2:20-SW-0617-AC (E.D. Cal.), I located several messages between user hopelyn_x0x and user eastbaylivinnn from July 6, 2020, regarding Ausk's purchase of a vehicle with cash. According to the messages, Ausk recently purchased a Mercedes Benz using "15 bands." Based on my training and experience and conversations with other law enforcement officers, a "band" is reference to one thousand dollars. Below is an excerpt of their text conversation:

> **Text** *And also just want you to know that I never fucked you over fool, on my life, I tried to keep in constant contact, and believe it or not I'm hot out here cops try to raid my shit every week it seems like, I did send 2 things to you , idk why it didn't get thru and I still have a pack waiting I was gonna send your boy, just know I'm doing good rinnow, really good so you need anything get at me, And I know but lemme tell you I regret my face tattoo so fucking bad, people judge me before anything I went and got a brand new Benz a week ago and the dealer wanted to treat me all weird till I dropped 15 bands right there, so just be smart about what you get feel me*
> **Author** hopelyn_x0x

72.     On July 6, 2020, Ausk provided user eastbaylivinnn with photos of the vehicle which depict a grey Mercedes Benz sedan. On June 29, 2020, I observed a 2016 grey Mercedes Benz bearing California license plate 7WXB415 in the driveway of 823 Sullivan Avenue in Stockton, California. During a surveillance operation on July 17, 2020, Ausk was observed driving a grey Mercedes Benz similar to the one in the shared photos bearing California license plate 7WXB415. According to California Department of Motor Vehicle records, the vehicle is registered to Ausk. I also observed Ausk driving the 2016 grey Mercedes Benz sedan on August 13, 2020 on southbound on Filbert Street in Stockton, California.

73.     While reviewing results received from Facebook for search warrant 2:20-SW-0617-AC (E.D. Cal.), I located several messages between user hopelyn_x0x and user eastbaylivinnn from July 6, 2020, regarding Ausk's unemployment scheme. Ausk asked user eastbaylivinnn if he wanted to make money with her and split it, and she confirmed

it is unemployment related. Ausk replied she "backdates" to receive a large amount of money up front. Ausk and user eastbaylivinnn discussed getting other inmates to provide their information to use for the scheme:

> **Text** *Wanna make a couple bands nothing bad split it w me this how I been making my money right now*
> **Author** hopelyn_x0x
>
> **Text** *Is it the unemployment*?
> **Author** eastbaylivinnn
>
> **Text** *Yessir I back date it so I get like 10k up front*
> **Author** hopelyn_x0x
>
> **Text** *Man i already somebody do it i cant re use it tho huh*
> **Author** eastbaylivinnn
> **Text** *Aye how bout i find niggas in here tho its gucci?*
> **Author** eastbaylivinnn
>
> **Text** *Yup do you thing I back date it so we will make moneyyyyy*
> **Author** hopelyn_x0x
>
> **Text** *Alright fosho ima try to gather up some atleast one forsure*
> **Author** eastbaylivinnn
>
> **Text** *How long did it take for ya to get the card mailed ? Was that how the money was*
> *being sent*
> **Author** eastbaylivinnn
>
> **Text** *And make sure they know your getting a cut and me cuz really I'm tryna help you cuz I can just do it myself and once your approved card comes in 10 days you can check to see when you card was shipped*
> **Author** hopelyn_x0x
>
> **Text** *Yea ima let em know i needa percentage fosho dont trip niggas here dont care as long as they get a band or few they straight*
> **Author** eastbaylivinnn

74.   According to postal records, Ausk and Griffin received mail in their names at the address of 823 Sullivan Avenue in Stockton, California. Records also indicate, as recent as August 17, 2020, that the same address has received mail addressed to names other than Ausk and Griffin, including financial mail and mail from the EDD, which manages unemployment claims for the State of California.

75.     Based upon my training and experience in mail theft investigations, I know that suspects often take the U.S. Mail that they obtained illegally to their residences so they can open and examine it in private. I also know that these same suspects often store the contents of stolen U.S. Mail at their residences – including in their homes, garages, sheds, and storage containers – and especially in their bedrooms and offices until they are ready to use it. Such contents often include identifications, bank account information, financial information, bankcards, government benefit information, PII, and other personal information. Finally, suspects who carry firearms often store or hide firearms in these same locations.

**Use of Electronic Devices for Criminal Activity and Forensic Analysis**

76.     Based on the above-described evidence, there is probable cause to believe that the Subjects used electronic devices—such as smart phones, cell phones, tablets, and computers as instrumentalities of their scheme and used the devices to store evidence and fruits of their crimes.

77.     As described above, many of the fraudulent access devices were registered via the internet, and, in some instances, a phone number or email address was provided. Also, an online purchase was made from Louis Vuitton and JSD Supply using one of the aforementioned access devices, also accessing social media platforms. These actions typically require the use of electronic devices.

78.     Based upon my training and experience, and my discussions with other law enforcement personnel, I am aware that it is common for perpetrators of mail theft, fraud and identity theft to use electronic devices to obtain information for the execution of their scheme or to disseminate scheme information to other individuals. I am also aware that the perpetrators of this scheme may reside and/or have committed these offenses within different cities and counties and may rely on mobile and electronic forms of communication with each other regarding their fraudulent activities.

79.     Based upon my training and experience, my conversations with other law enforcement personnel assisting in this case, and my investigation in this case, I am aware that persons

involved in identity theft, mail theft, credit card fraud, and bank fraud, along with their conspirators/accomplices use smart phones, cell phones, tablets, and computer laptops to communicate with one another, either by voice calls, emails, or text messages regarding their fraud and theft activities. I know that perpetrators who use such devices commonly exchange real time information about theft and fraud activity and other information regarding execution of theft or fraudulent transactions. Such information can be found stored in the text/email messages and images on such devices. Such persons also use the devices to link with the internet to obtain addresses and maps and locations/addresses of victims, including but not limited to merchants, banks, and individual identity theft victims. Such devices can also be used to: remotely make online fraudulent purchases, perform false or fraudulent mobile banking operations and checks (verifications), and distribute the proceeds of fraudulent activities to co-conspirators via banking and money-transfer applications.

80.    Based upon my training and experience, my conversations with other law enforcement personnel assisting in this case, and my investigation in this case, I am aware that the complete contents of text messages, image files, and emails may be important to establishing the actual user who has dominion and control of a particular phone or computer at a given time. Cell phones may be subscribed to under false names with little to no verification by the service provider. Cell phones and computers may also be used by multiple people. Given the ease with which such items may be obtained and used, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of a particular cell phone or device that was used to send a particular text or email message, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular cell phone or device. Often, by piecing together information contained in the contents of the device (cell phone or computer or storage device) an investigator can establish the identity of the actual user. Often, those pieces will come from a time period before the device was used in criminal activity. Limiting the scope of the search for information showing the actual user of the device

would, in some instances, prevent the government from identifying the user of the device and, in other instances, allow a defendant to possibly suggest that someone else was responsible. Therefore, the entire content of a communication device often provides important evidence regarding the actual user's dominion and control of the device. Moreover, review of the contents of communications of electronic storage devices, including text and email messages sent or received by the subject device assist in determining whether other individuals had access to the device.

81.     Based upon my training and experience, my conversations with other law enforcement personnel assisting in this case, and my investigation in this case, I am aware that criminals discussing their criminal activity via electronic communication devices (email and text messaging) may use images, slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or code words (which require entire strings or series of text message conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. It is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a text message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and paren :) to convey a smile or agreement) to discuss matters. "Keyword searches" or other automated methods of review of the text messages sent to and from the subject device would not account for any of these possibilities, so actual review of the text and email messages by law enforcement personnel with information regarding the identified criminal activity is necessary to find all relevant evidence.

82.     Based upon my training and experience, my conversations with other law enforcement personnel assisting in this case, and my investigation in this case, I have learned the following additional information:

    a.      Individuals who steal, misdirect, take, unlawfully possess, or by fraud or deception obtain, U.S. Mail often maintain the U.S. Mail, and its contents –

including access devices, bankcards, and gift cards – for long periods of time to exceed months. Such individuals will also scan onto computers, cell phones, and computer storage devices stolen mail or fraudulently obtained mail (and its contents) and maintain on computers, cell phones, and storage devices co-conspirators names, victim's names, addresses (of victims, associates, accomplices), and stolen means of identification, to include images of such, thereby reducing such items' exposure to law enforcement and the community. Individuals use their cell phones and personal computers to make online purchases using gift cards to order items that will be shipped to their residences.

b.     I am aware that even if a perpetrator deletes evidence of criminal activity (such as identity theft, and fraudulent use of financial information in U.S. Mail) from electronic storage devices, the evidence often can be recovered from the devices, including computers or other forms of electronic storage media.

83.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

84.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on an electronic device's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic devices and storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

85.     There is probable cause to believe that things that were once stored on any electronic devices located at any of the PREMISES may still be stored there, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media-in particular, computers' internal hard drives-contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

86.      Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how electronic devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the electronic devices found because:

29

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.  I know that when an individual uses an electronic device, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

87.  Necessity of seizing or copying entire computers or storage media. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.  The time required for an examination.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly

examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.     Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

88.   Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of electronic devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a device to human inspection in order to determine whether it is evidence described by the warrant.

89.   Manner of execution.  Because this portion of the warrant—seeking forensic examination of electronic devices found—seeks only permission to examine device(s) that would be already in law enforcement's possession, the execution of the forensic examination would not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of such examination at any time in the day or night following the seizure of the device.

90.     Because several people share the addresses listed in Attachment A-1 as a residence, it is possible that the locations will contain electronic devices and storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is probable that the things described in this warrant could be found on any of those devices or storage media, the warrant applied for would permit the seizure and review of those items as well.

### Comparability with Prior Investigations and Experience

91.     Based on my review of the records and documents in this case, my training and experience, and my discussions with other law enforcement personnel in this investigation, I do not believe contact between any law enforcement and the individuals perpetrating this scheme will necessarily result in them destroying or moving all evidence, fruits, or instrumentalities of the crimes. I am aware that even after contact with law enforcement, individuals involved in schemes to defraud, and attempts to defraud, federally insured financial institutions will not always cease criminal conduct. To the contrary, such individuals often are emboldened, believing they are no longer targets or suspects. I am aware that often such individuals immediately return to obtaining, and altering fraudulently obtained identification and financial information. In addition, individuals retrieve secreted catalogues, saved and profiled contents of fraudulently obtained financial information and property from areas law enforcement did not search or seize. The individuals will then maintain the items in close proximity, including in their residence. Also, the individuals will—after initial discovery by law enforcement—return to obtaining further identification and financial information (including replacement access devices and PIN numbers for replacement credit/debit cards). Of course, I am also aware based on my training and experience that individuals in schemes such as this one, who have not been confronted by law enforcement, also continue their participation in the criminal conduct.

92.     Also, based on my training and experience, and my discussions with other law enforcement personnel, I am aware that following contact with law enforcement,

individuals involved in schemes to defraud, and attempts to defraud federally insured financial institutions will occasionally change vehicles in order to continue criminal conduct, including fraud.

93.   I am aware that individuals involved in bank fraud, credit card fraud, aggravated identity theft, possession of stolen U.S. Mail, and theft of U.S. Mail, and conspiracy to commit such offenses (including schemes to acquire and to use federally insured bank credit cards assigned to others), obtain access devices, PIN numbers, financial information, identity information, checks and other personal and financial information of victims via stolen U.S. Mail and other thefts. Such individuals, working together, often maintain close contact and travel together. I am aware that in mail theft, bank fraud, mail fraud, and identity theft schemes, perpetrators often use victim names and pose as victims online to make internet transactions, to open accounts, and to cause fraudulently purchased items to be mailed in the victims' names. After contact with law enforcement, mailings and parcels in furtherance of access device fraud, identity theft, bank and other fraud schemes continue to be received by perpetrators, including the name(s) of other and victims. Perpetrators receive mailings and parcels in other names to avoid detection and to create a layer of anonymity by, for example, continuing to change the identities being used. Also to avoid detection, perpetrators will cause fraudulently purchased items to be mailed and stored at different locations. I am aware that perpetrators will keep tools, implements, financial statements, access devices, and stolen items close to themselves (especially in vehicles they use, or their person, in their residences, in the residences of extended family members, and in storage units) or in areas to which they have access in order to ensure custody and control of the items and for easy access for use or disposal.

## CONCLUSION

94.   For the reasons stated above, there is probable cause to believe that Hopelyn Ausk committed the offense of Bank Fraud, in violation of 18 U.S.C. § 1344, on or about September 2, 2019.

95.     For the reasons stated above, there is also probable cause to believe that evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. § 371 – Conspiracy; § 1708 – Possession of Stolen U.S. Mail; § 1704 – Possession of Stolen or Counterfeit Postal Keys or Locks; § 1028A – Identity Theft; § 1344 – Bank Fraud; § 1341 – Mail Fraud; § 922(g) – Felon in Possession; and 26 U.S.C. § 5861 – Possession of an Unregistered Firearm, as more fully described in Attachment B, hereby fully incorporated herein, may be found at the Premises or on the Subjects identified in Attachments A-1 through A-5, attached and fully incorporated herein.

**[CONTINUED ON NEXT PAGE]**

## REQUEST TO SEAL

96.    This case is the product of a covert investigation. Based on my training and experience in
investigations such as this one, I believe that public disclosure of the existence of this
affidavit, complaint, arrest warrants and/or search warrants may have a significant and
negative impact on the continuing investigation and may severely jeopardize law
enforcement efforts to execute the warrants. Also, premature disclosure may pose a risk
to executing law enforcement. It is respectfully requested that this Court issue an order
sealing, until further order of the Court, all papers submitted in support of this affidavit,
the accompanying search warrant, and application.


/s/ Elizabeth Foley
Elizabeth Foley
U.S. Postal Inspector
United States Postal Inspection Service

Approved as to form.

Robert J. Artuz
Special Assistant U.S. Attorney


Subscribed and sworn to me telephonically on 3rd day of September, 2020.


KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

36

**ATTACHMENT A-1**

The place to be searched: 823 Sullivan Avenue, Stockton, California 95205, including the house, garage, and all storage sheds, temporary structures, and containers at the residence and residence yard.  The residence is shown in the photographs below and is further described as follows: 823 Sullivan Avenue is a single story 2 bedroom, 1 bath, house located on the west side of Sullivan Avenue with grey siding, white trim, dark grey shingles, and a white metal security screen door. The numbers "823" are affixed to the trim of the front porch above the front door. The front yard is surrounded by a chain link fence with a chain link gate to the driveway.



This warrant authorizes the forensic examination of electronic devices at the location for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-2**

The place to be searched is a grey 2016 Mercedes Benz sedan, with California license plate 7WXB415 registered to Hopelyn Ausk, which is depicted parked in driveway of 823 Sullivan Avenue, Stockton, CA 95205, in the below photograph:



This warrant authorizes the forensic examination of electronic devices at the location for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-3**

The place to be searched is a red Dodge Challenger with a double silver racing stripe running down the entire top, center of the vehicle, and with a California Temporarily Operating Permit marked with the number "8" in the rear window, which is depicted parked in driveway of 823 Sullivan Avenue, Stockton, CA 95205, in the below photograph:



This warrant authorizes the forensic examination of electronic devices at the location for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-4**
*Person to be searched*

The person to be searched is Hopelyn Rhiannon AUSK.  AUSK is a white female, approximately 5'5", with red hair and blue eyes.  AUSK's date of birth is XX/XX/1996.  AUSK's photograph appears below.



The search of AUSK shall include her person, clothing, and personal belongings, including backpacks, briefcases and bags, that are within the immediate vicinity and control at the location where the search warrant is executed and that may contain the items called for by Attachment B to this warrant.

**ATTACHMENT A-5**
*Person to be searched*

The person to be searched is Marcus Winston GRIFFIN.  GRIFFIN is a white male, approximately 6'2", with brown hair and hazel eyes.  GRIFFIN's date of birth is XX/XX/1991.  GRIFFIN's photograph appears below.



The search of GRIFFIN shall include his person, clothing, and personal belongings, including backpacks, briefcases and bags, that are within the immediate vicinity and control at the location where the search warrant is executed and that may contain the items called for by Attachment B to this warrant.

**ATTACHMENT B**

The evidence to be searched for and seized concerns violations of Title 18, United States Code, Sections 371 (conspiracy), 1708 (possession of stolen U.S. Mail), 1704 (possession of stolen or counterfeit postal keys or locks), 1028A (aggravated identity theft), 1344 (bank fraud), 1341 (mail fraud), 922(g) (felon in possession), and Title 26, United States Code Section 5861 (possession of unregistered firearm) whether physical, digital, electronic, or otherwise, occurring after January 17, 2019, and is described in the enumerated list below:

1. Items and information tending to identify persons exercising dominion and control over the location or particular areas within the location, including correspondence, papers, photos, videos, bank statements, credit card statements, receipts, utility bills, emails, internet transaction records, parcels, mail, and clothing;

2. United States mail, identification documents, and access devices bearing the names of, or otherwise tending to pertain to, persons who do not live at or control the location;

3. Documents, records, and information relating to the contents of mail or property in the names of persons who do not live a or control the location, together with indicia of possession, control, ownership or use of such mail or property;

4. Documents, records, and information tending to show how money associated with the theft or possession of U.S. Mail was obtained, secreted, transferred, and/or spent, including online purchases and electronic transfer of funds;

5. U.S. Currency over $5,000;

6. Documents, records, and information containing, referencing, or listing the following types of personal identifying information for individuals, businesses or merchants: names, dates of birth, Social Security Numbers, email addresses, telephone numbers, passwords, bank account numbers, credit card numbers, charge card numbers, credit card images, PIN numbers;

7. Credit cards, debit cards, gift cards and documents, records, and information pertaining to the possession, control, ownership, or use of credit cards, debit cards, gift cards, including items obtained through transactions involving credit cards, debit cards, and gift cards;

8. Financial instruments, documents, and information for all cards and/or accounts in the names of suspected victims and other persons who do not live at 823 Sullivan Avenue, Stockton, CA 95205, including the following: credit applications, account applications, account numbers, credit cards, charge cards, store specific account cards, prepaid debit cards, business and personal checks, receipts, account statements, account related correspondence, records of goods and services obtained, electronic books, money drafts,

letters of credit, money orders, cashier's checks and receipts, deposits and withdrawal slips, and passbooks;

9. Documents, records, and information pertaining to unemployment benefits (whether or not attempted or successfully) for names other than Hopelyn Ausk and Marcus Griffin;

10. All bank records, checks, credit card bills, account information, and other financial records;

11. Documents, records and information constituting, discussing, establishing or tending to constitute, discuss or establish: (a) fraudulent or unauthorized activity involving personal identification information, and (b) the theft and trafficking of personal identification information;

12. Tools and materials usable to make identification documents, check, or financial documents, including: templates and software for making identifications, checks, or credit cards; laminating machines, printers, electronic reader writers, label makers, heat sealers, embossers, and identification imprinters, and access devices; and check washing materials, paper stock, chemicals such as acetone to remove ink, and magnetic ink;

13. Records and information relating to the internet service provider and Internet Protocol address assigned to the premises;

14. Documents, records, and information pertaining to the purchase of or sale of firearms or firearms parts, ammunition, or explosives;

15. Firearms, firearm parts, ammunition, and explosives;

16. Evidence that may identify any coconspirators, coschemers, or aiders and abettors, including records that help reveal their whereabouts;

17. Communications between coconspirators, coschemers, and aiders and abettors;

18. Evidence indicating the subjects' state of mind as it relates to the crimes under investigation;

19. Historical location information, including GPS data, historical cell-site data, and precise location information;

20. Photographs, images, and communications regarding any information responsive to any of the above Paragraphs; and

21. With respect to "digital devices," in addition to all of the categories described in the preceding Paragraphs, items and information to be seized include any electronic records, including e-mail messages, text messages, videos, electronic documents, images, and/or data:

    a.   tending to identify persons exercising dominion and control over each digital device searched; and

    b.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of any electronic information responsive to any of the above Paragraphs.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

The terms "digital devices" and "electronic devices" mean computers, computer tablets (e.g., iPads), electronic storage devices (e.g., hard drives, thumb drives), smart phones, mobile phones, cellular phones, and POS terminals. The seizure and search of digital devices shall follow the procedures outlined in the supporting affidavit. Deleted data, remnant data, slack space, and temporary and permanent files on the digital devices may be searched for the evidence above.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

The term "IP address" or "Internet Protocol address" means a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

The term "Internet" means a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br>INFORMATION ASSOCIATED WITH Username<br>HopelynAusk123116; ID 100004164905535 and<br>Username marcus.griffin; ID 100006739772423 THAT IS<br>STORED AT PREMISES CONTROLLED BY<br>FACEBOOK, INC. | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.    2:20-sw-0940 DB

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____ *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ October 23, 2020 _____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    _____ 10/9/2020 1:48 p.m. _____

City and state:    _____ Sacramento, California _____

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
                    Signature of Judge                                                    Date

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook accounts with the following usernames and/or IDs:

Username HopelynAusk123116; ID 100004164905535

Username marcus.griffin; ID 100006739772423

(the "accounts" or "subject accounts") that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., a social-media company headquartered in Menlo Park, California. The information for the accounts should include account information preserved pursuant to preservation requests served on Facebook on September 18, 2020, and any new account information created subsequent to any preservation.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Facebook, Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, Inc., including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, Inc., or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook, Inc. is required to disclose the following information to the government for each account listed in Attachment A:

a.     All identity and contact information, including full name, e-mail address, physical address (including city, state, and zip code), date of birth, phone numbers, gender, hometown, occupation, and other personal identifiers;

b.     All past and current usernames associated with the accounts;

c.     The dates and times at which each account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

d.     All activity logs including IP logs and other documents showing the IP address, date, and time of each login to the accounts, as well as any other log file information;

e.     All information regarding the particular device or devices used to login to or access the account, including all device identifier information or cookie information, including all information about the particular device or devices used to access the account and the date and time of those accesses;

f.     The identity of any other accounts accessed by the same device that accessed the subject accounts, including accounts linked by machine cookies, and the identity of any other accounts that are registered with the same email addresses or telephone numbers as the subject accounts;

g.     All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

h.     All communications or other messages sent or received by the account from January 17, 2019, to Present;

i.      All user content created, uploaded, or shared by the account, including any comments made by the account on photographs or other content January 17, 2019, to Present;

j.      All photographs and images in the user gallery for the account January 17, 2019, to Present;

k.      All location data associated with the account, including geotags January 17, 2019, to Present;

l.      All data and information that has been deleted by the user January 17, 2019, to Present;

m.      A list of all of the people that the user follows on Facebook and all people who are following the user (*i.e.*, the user's "following" list and "followers" list), as well as any friends of the user;

n.      A list of all users that the account has "unfollowed" or blocked;

o.      All privacy and account settings;

p.      All records of Facebook searches performed by the account, including all past searches saved by the account January 17, 2019, to Present;

q.      All information about connections between the account and third-party websites and applications; and,

r.      All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services, and all records of actions taken, including suspensions of the account.

Facebook, Inc. is hereby ordered to disclose the above information to the government within **14 DAYS** of issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 1708 – Possession of Stolen U.S. Mail; 18 U.S.C. § 1704 – Possession of Stolen or Counterfeit Postal Keys or Locks; 18 U.S.C. § 1028A – Identity Theft; 18 U.S.C. § 1341/43 – Mail or Wire Fraud; 18 U.S.C. § 1344 – Bank Fraud; 18 U.S.C. § 922(g) – Felon in Possession

of a Firearm, involving Hopelyn Ausk or Marcus Griffin since January 17, 2019, including, for each account identified on Attachment A, information pertaining to the following matters:

(a) Evidence of mail theft, mail/wire fraud, identity theft, bank fraud, and illegal firearm possession;

(b) Evidence indicating how and when each Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating each Facebook account owner's state of mind as it relates to the crimes under investigation;

(d) The identity of the person(s) who created or used each user ID, including records that help reveal the whereabouts of such person(s);

(e) The identity of the person(s) who communicated with each user ID about matters relating to mail theft, mail fraud, ID theft, bank fraud, and illegal firearm possession, including records that help reveal their whereabouts;

(f) Communications between or among coconspirators or coschemers regarding the crimes under investigation;

(g) Photographs, images, and videos of firearms, firearm parts, and ammunition;

(h) Photographs, images, and videos of U.S.P.S. keys, locks, key codes, or other property;

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS<br>PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____, and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of _____.  The attached records consist of _____.  I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of _____, and they were made by _____ as a regular practice; and

b.      such records were generated by _____ electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of _____ in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by _____, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____       _____
Date                                                    Signature